

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*50 Main Street, Suite 1100*
*White Plains, New York 10606*

September 18, 2023

**BY ECF AND EMAIL**
The Honorable Andrew E. Krause
United States Magistrate Judge
Southern District of New York
United States Courthouse
300 Quarropas Street
White Plains, NY 10601

      Re:   *United States v. Maxim Marchenko, 23 Mag. 6181*

Dear Judge Krause:

      The Government respectfully submits this letter outlining its position on bail. As set forth below, the defendant Maxim MARCHENKO is charged, on overwhelming evidence, with playing a primary role in an illicit procurement network responsible for fraudulently obtaining large quantities of dual-use, military grade micro-electronics from U.S. distributors and then smuggling these sensitive technologies to the Russian Federation ("Russia"). MARCHENKO, a Russian national and resident of Hong Kong, has extensive ties overseas and, given these ties, there is no combination of conditions that would address his extreme risk of flight. In light of these factors, the Government requests a detention hearing under 18 U.S.C. § 3142(f)(2), and firmly believes that detention is warranted.

    **I.**    **PROCEDURAL BACKGROUND**

      On August 25, 2023, a seven-count criminal complaint was filed in the Southern District of New York charging Maxim MARCHENKO with (1) conspiracy to defraud the United States; (2) conspiracy to commit money laundering; (3) conspiracy to smuggle goods from the United States; (4) promotional money laundering; (5) smuggling goods from the United States; (6) conspiracy to commit wire fraud; and (7) wire fraud. MARCHENKO was arrested outside of the United States at approximately 1:58 a.m. EST on or about Sunday, September 17, 2023.[1]

---

[1] "A person making an arrest outside the United States must take the defendant without unnecessary delay before a magistrate judge, unless a statute provides otherwise." Fed. R. Crim. P 5(a)(1)(B). Here, the defendant was arrested on Sunday morning and is being presented the next day in the prosecuting district. *Cf. United States v. Dominguez-Caicedo*, 40 F.4th 938, 951 (9th Cir. 2022) (noting that the proper inquiry under Rule 5 is whether "transportation to the United States as a whole was unnecessarily delayed" and that "twenty-three days" did not amount to "unnecessary delay" under Rule 5); *United States v. Campo Flores*, S5 15 Cr. 765 (PAC), 2016 WL 5946472, at *9-10 (S.D.N.Y. Oct. 12, 2016) (finding 2-day delay in presentment not

MARCHENKO was immediately brought to the United States, and he arrived in Westchester County, New York at approximately 6:30 p.m. EST on or about Sunday, September 17, 2023. MARCHENKO will be presented later today.

II.     **FACTUAL BACKGROUND**

Maxim MARCHENKO and two co-conspirators ("CC-1" and "CC-2"), also Russian nationals, have held primary roles in operating an illicit procurement network responsible for smuggling sensitive U.S. technologies out of the United States to Russia (the "Procurement Network"). One of the main goals of the Procurement Network is to fraudulently obtain large quantities of dual-use, military grade micro-electronics, specifically OLED micro-displays manufactured by a particular American company based in Dutchess County, New York ("Company-1" and the "Micro-Displays"). These Micro-Displays have civilian applications and military applications, such as in rifle scopes, night-vision goggles, thermal optics, and other weapon systems.

As part of his role with the Procurement Network, MARCHENKO maintains and operates several front companies in Hong Kong, which are located at the same address on Castle Peak Road in Hong Kong (the "Castle Peak Address"), including Alice Components Co. Ltd. ("Alice Components"), Neway Technologies Limited ("Neway"), and RG Solutions Limited ("RG Solutions"). As set forth in greater detail below, MARCHENKO is essential to the operation of the Procurement Network because the Procurement Network relies on his Hong Kong-based front companies to conceal the fact that the Micro-Displays are destined for Russia.

***The Procurement Network Prior to February 2022.*** As alleged in the Complaint, since in or about October 2014, the Procurement Network has obtained thousands of military grade Micro-Displays from Company-1 on behalf of end users in Russia, such as Emercom Russia—a Russia state-owned civil defense organization. Prior to Russia's invasion of Ukraine, the Procurement Network used companies located in Russia such as Radiofid Systems ("Radiofid") to place orders with Company-1, and Company-1 categorized Radiofid's orders in 2020 and 2021 as "Military." At least some of these Radiofid orders destined for Russia were shipped directly to MARCHENKO at the Castle Peak Address in Hong Kong. In addition, MARCHENKO used another front company, Neway, to pay for at least some for these orders.

***The Procurement Network After February 2022.*** Following Russia's invasion of Ukraine in or about February 2022, Company-1 decided that it would not sell their products to Russian customers or customers who shipped their products to Russia. An executive at Company-1 explained in an internal email: "Probably more than obvious at this time, but the Company and

---

unreasonable where the DEA and defendant departed Haiti for New York as soon as custody was transferred, the defendant arrived after court had closed for the day and the following day was Veterans Day, and it was "highly doubtful" that defendant could have been presented before the nearest available magistrate before the courts closed); *see also United States v. Aragon*, 2017 WL 2889499, at *14 (S.D.N.Y. Jul. 5, 2017) (finding 16-day delay in presentment caused by transporting defendants from the Pacific Ocean to New York for prosecution was not unreasonable).

September 18, 2023
Page 3 of 4

Board have decided it is no longer right for us to sell or ship to Russian customers and risk that our displays will be used in devices that could put US or NATO forces in harm's way, or support Russia's unlawful invasion of Ukraine and its human rights abuse."

As alleged in the Complaint, the Procurement Network then devised a cover story to conceal the fact that the Micro-Displays they ordered were destined for Russia. Specifically, the Procurement Network began using MARCHENKO's front company, Alice Components, to order Micro-Displays from Company-1. As part of this cover story, or "legend" as CC-1 called it, CC-1 posed as "Amy Chan," the purchase manager for Alice Components, to communicate with Company-1. In or about June 2022, Alice Components placed its first order with Company-1 for 500 Micro-Displays for approximately $292,050 (the "June Order"). That same month, MARCHENKO received a contract for RG Solutions to sell electronic components to a Russian company known as MEC LLC. Prior to MARCHENKO paying Company-1 using RG Solutions, OOO NPTC Topaz, a Russia-based company with connections to CC-2, sent two wires to RG Solutions for a total of approximately $292,000 (*i.e.*, the approximate cost of the June Order). Both wires referenced the contract between RG Solutions and MEC LLC.

Despite the fact that (i) MARCHENKO's front company, RG Solutions, entered into a contract to supply a Russian company with electronic components, and (ii) RG Solutions received wires from a Russian company in the approximate amount of the June Order that referenced these contracts, CC-1 (posing as Amy) submitted a presales questionnaire to Company-1 that falsely stated that Alice Components wanted to purchase 3,000 to 5,000 Micro-Displays annually to be used in "electron microscopes" for "medical research" and listed the end-user countries as China, Hong Kong, Malaysia, and Europe.

Company-1 shipped the June Order in two shipments: one on or about June 30, 2022, and the other on or about August 4, 2022. Because the value of the Micro-Displays was more than $2,500, federal regulations required the exporter (here, Company-1) to file an Electronic Export Information ("EEI"). Company-1 submitted two EEIs for the June Order (one for each shipment) using information provided by CC-1 on behalf of Alice Components. Accordingly, the EEIs listed a freight forwarding company in Hong Kong as the ultimate consignee and the destination as Hong Kong—*i.e.*, not Russia or a Russian end user.

As alleged in the Complaint, after placing this initial order, CC-1 (posing as Amy) tried to order an additional 2,000 Micro-Displays from Company-1 under the guise that the Micro-Displays would be used for medical research outside of Russia. When Company-1 asked CC-1 (posing as Amy) to confirm that neither Russia nor Ukraine was the end country, CC-1 (despite knowing that the Micro-Displays were destined for Russia) continued to lie to Company-1 and replied: "I confirm that this does not include Russia or Ukraine for end country." A presales questionnaire was again submitted by CC-1 (posing as Amy). The questionnaire again contained the same falsehoods as the previous questionnaire but now identified the end user as the National Health Commission of the People's Republic of China—another lie.

This order was not fulfilled, and Company-1 instead referred Alice Components to an undercover company (the "UC Company"), which it described as a distributor of Company-1's Micro-Displays.

**MARCHENKO's Efforts to Circumvent U.S. Laws with the UC Company.** Undeterred by Company-1 refusing to sell the Micro-Displays to Radiofid and Alice Components, the Procurement Network, as alleged in the Complaint, turned to the UC Company in or about November 2022 to continue purchasing the Micro-Displays on behalf of Russian end users. Alice Components, through CC-1 (posing as Amy), told the UC Company that the Micro-Displays would be used in electron microscopes for medical research and the end user was the National Health Commission for the People's Republic of China. Alice Components initially ordered 50 Micro-Displays from Company-1. To maintain the Procurement Network's cover story, CC-1 told MARCHENKO to pay for the order using RG Solutions and further advised MARCHENKO that he could not pay for the order with Neway because MARCHENKO used Neway to pay for Russia-based Radiofid's orders from Company-1. MARCHENKO ultimately paid the UC Company using another one of his Hong Kong-based front companies, Namfleg Limited. After the 50 Micro-Displays were shipped on or about November 30, 2022, IP addresses connected to NPC Granat—a Russia based electronics company associated with CC-2—checked the tracking information for the shipment.

The next month, in or about December 2022, Alice Components, through CC-1, purchased 2,450 additional Micro-Displays from the UC Company for a total of approximately $1,594,000. Following the order, CC-2 indicated that he would start sending payments to MARCHENKO, and the pair also discussed how CC-2 could pay MARCHENKO's front companies. Between in or about December 2022 and in or about February 2023, MARCHENKO's front companies made fourteen separate wire transfers for a total of approximately $1,333,294.85 from Hong Kong-based accounts to the UC Company's bank account located in Manhattan, New York. After 700 of the 2,450 Micro-Displays were shipped on or about February 14, 2023, IP addresses associated with NPC Granat (a Russian company) again checked the tracking information for the shipment.

On or about March 4, 2023, the UC informed CC-1 (posing as Amy) that the Department of Commerce ("Commerce") had detained the shipment of 700 Micro-Displays because of a concern that it would be diverted to prohibited end users in Russia. Two days later, CC-1 messaged MARCHENKO the name and phone number of an undercover agent posing as an employee of the UC Company (the "UC"). That same day, MARCHENKO used a phone number ending in 1175 (which he had included on his November 2022 nonimmigration visa application that he submitted to the United States Citizenship and Immigrations Services) to have a recorded phone conversation with the UC. During the call, MARCHENKO identified himself as "Maxim" from "Alice Components" and stated that he worked with "Amy" – a reference to CC-1's ficitious persona. MARCHENKO then falsely explained that payment for Alice Components's orders was coming from a third party because his bank accounts were being closed. MARCHENKO knew that this representation was false because he and other members of the Procurment Network, including CC-1 and CC-2, discussed using his Hong Kong-based front companies to obfuscate the fact that payment for the Micro-Displays came from Russia.

After Commerce released the shipment, in or about July 2023, the UC informed CC-1 that the UC Company was in possession of the Micro-Displays. As alleged in the Complaint, on or about August 14, 2023, the UC and MARCHENKO exchanged several messages about the Micro-Displays. In particular, MARCHENKO asked the UC if the UC could "send low value parcel by

USPS" and "make value below 2500usd"—*i.e.*, the threshold value for when an EEI must be submitted. When the UC expressed some concern with this plan, MARCHENKO responded that there was "less risk" and he had "do[ne] before." In fact, when the UC asked who to put on the end user form, MARCHENKO demonstrated his understanding of federal commerce regulations and requirements when he responded: "below 2500usd no need." In other words, MARCHENKO tried to coerce the UC to help him circumvent the EEI filing requirements, and thus avoid reporting the true destination of these goods (Russia), by misrepresenting the value of the Micro-Displays.

Shortly thereafter, the UC offered to hand deliver the Micro-Displays to MARCHENKO and suggested meeting in a third country ("Country-1"). Before agreeing to meeting the UC in Country-1, MARCHENKO told the UC he would need to check the "customs regulation" of Country-1. After determining that he thought "nobody will check there," MARCHENKO agreed to meet the UC in Country-1 and immediately began to look up flight options from Hong Kong to Country-1.

On or about September 17, 2023, at a previously agreed upon place and time, MARCHENKO and another individual ("CC-3") met the UC in Country-1 for the purpose of picking up 2,450 Micro-Displays. During the meeting, in substance and in part, MARCHENKO stated that (i) the Micro-Displays are used for hunting rifles[2]; (ii) Alice Components would give the UC Company the contract for Alice Components to purchase an additional 7,500 Micro-Displays (which CC-1 had previously discussed with the UC); and (iii) he created bank accounts and businesses in Switzerland to facilitate the Procurement Network's operations. In addition, MARCHENKO did not deny that CC-1 was located in Russia when CC-1 was communicating with the UC, and MARCHENKO identified additional parts that he would like to purchase. At one point during the meeting, the UC told MARCHENKO that he/she was worried that the Micro-Displays would be found in weapons on battlefields in Ukraine and that serial numbers would connect the Micro-Displays to the UC Company. MARCHENKO denied that the parts were going to Ukraine and replied, in substance and in part, that lasers were available and so they could take care of the serial numbers. The UC also told MARCHENKO that Alice Components could not continue to use the lie that the end user of the Micro-Displays was the National Health Commission of the People's Republic of China. MARCHENKO replied, in substance and in part, that they (the Procurement Network) had different end users that they could use. The UC also stated that he/she was willing to hand deliver Micro-Displays for future orders and suggested that MARCHENKO meet the UC or his/her representatives in third countries to pick up the Micro-Displays. CC-3 stated that she could meet the UC to pick up future orders.

Following his arrest, MARCHENKO acknowledged that he understood his *Miranda* rights. He then waived those rights and agreed to speak with law enforcement agents. In substance and in part, MARCHENKO admitted, among other things, to working with CC-1 and CC-2 and purchasing goods from Company-1 (among other U.S. companies), meeting CC-1 in Russia, receiving money from Russia, doing approximately 60% of his business with Russian companies,

---

[2] On or about March 16, 2023, Politico reported that China shipped 1,000 assault rifles, categorized as "civilian hunting rifles," to Russia between June and December 2022. *See* https://www.politico.com/news/2023/03/16/chinese-rifles-body-armor-russia-ukraine-00087398.

traveling to China to open a bank account, having bank accounts in South Korea, and that CC-2 is connected to OOO NPTC Topaz and Infotechnika.

### III.  LEGAL STANDARD

The Bail Reform Act of 1984 (the "Act") permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The Court "does not need to find both bases are proven in order to order a defendant's detention," as a finding of either dangerousness or risk of flight may justify remand. *United States v. Epstein*, 425 F. Supp. 3d 306, 312 (S.D.N.Y. 2019). The Government must show "by clear and convincing evidence that the defendant presents a danger to the community and by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight." *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (internal quotation marks omitted); *see United States v. Brennerman*, 705 F. App'x 13, 16 (2d Cir. 2017) (setting threshold for preponderance of evidence as a "circumstance [that] was more likely than not" (internal quotation marks omitted)).

The Act requires consideration of several statutory factors. The Act requires consideration of (1) the nature and circumstances of the offenses; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g). Although the Act "lists various factors to consider, it says nothing about the relative weight a court should give them when deciding whether to release or detain a defendant." *United States v. Zhang*, 55 F.4th 141, 149 (2d Cir. 2022). And while some courts have described the weight of the evidence as the least important factor, *see United States v. Paulino*, 335 F. Supp. 3d 600, 613 (S.D.N.Y. 2018) ("[M]any courts have suggested that the weight of the evidence is the least important of the various factors."), the Second Circuit has made clear that "a preliminary assessment of the strength or the weakness of the evidence can be a key consideration in whether the defendant is dangerous or poses a flight risk, and such a finding does not in fact impinge upon the presumption of innocence, *Zhang*, 55 F.4th at 152; *see also English*, 629 F.3d at 317 ("The weight of the evidence against the defendant is a factor that is to be taken into consideration . . . . As far as this Court is concerned, it is one of the most important factors to consider.").

As in a preliminary hearing, the Government may meet its burden "by proffer alone." *United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000) (internal quotation marks omitted). "[B]ail hearings are typically informal affairs, not substitutes for trial or discovery," and so "courts often base detention decisions on hearsay evidence." *United States v. Abuhamra*, 389 F.3d 309, 321 n.7 (2d Cir. 2004) (internal quotation marks omitted).

### IV.  DETENTION IS WARRANTED IN THIS CASE

The Section 3142(g) factors compel detention in this case for the reasons set forth below.

***Risk of Flight.***  Without a doubt, MARCHENKO is "more likely than not" a flight risk. *Brennerman*, 705 F. App'x at 16 (internal quotation marks omitted).  To start, MARCHENKO has extensive ties to Russia and Hong Kong: MARCHENKO is a Russian citizen and holds two valid Russian passports. Additionally, he has been a lawful permanent resident of Hong Kong since at

least in or about September 2019. Moreover, MARCHENKO frequently travels internationally and has traveled to, among other places, Russia (multiple times), China (multiple times), Turkey, the Philipines, the Republic of Korea, Thailand (multiple times), Japan (multiple times), Georgia, and Europe in the last approximately five years. *Cf. United States v. Fishenko*, 2013 WL 3934174, at *2 (E.D.N.Y. July 30, 2013) (noting that the fact that the defendant "frequently travels to Russia for business increases the likelihood of flight" (internal quotation marks omitted)).

Even further concerning with respect to flight risk are MARCHENKO's personal ties to Hong Kong where he maintains a personal residence with his wife and children and several businesses, some of which serve as front companies for the Procurement Network. Moreover, and troublingly, MARCHENKO admittedly has several overseals bank accounts, and MARCHENKO also appears to have access to significant resources overseas, including several foreign bank accounts in the names of his front companies and in the names of other individuals and entities that make up the Procurement Network. Indeed, MARCHENKO's primary role, as set forth in the Complaint, was to act as the financial intermediary for the Procurement Network. His web of overseas bank accounts and his vast access to resources overseas is what allowed the Procurement Network to operate. That is a significant factor that weighs in favor of detention. *See*, *e.g.*, *United States v. Mallory*, 268 F. Supp. 3d 854, 864 (E.D. Va. 2017) (finding risk of flight where, among other things, defendant "spent significant amount of time in China, he has at least $6,500 in a Hong Kong bank, and likely has unknown other foreign bank accounts given his text message to [a Chinese Government Official] where he asks that deposits be made into a foreign account under an alias"). MARCHENKO, therefore, not only has powerful incentives to flee but also the apparent means and international connections to flee regardless of whatever conditions the Court may impose, including by eliminating legitimate means of travel. *United States v. Babichenko*, No. 1:18-CR-00258-EJL, 2018 WL 4604015, at *4 (D. Idaho Sept. 25, 2018) (finding while defendant had strong ties to local community he also had powerful incentive to flee along with the means and connections to do so despite conditions ordered by the court).

At bottom, MARCHENKO was essential to the operation of the Procurement Network that provided sensitive technologies to end users in Russia, and he maintains significant ties abroad with individuals in Russia, including CC-1, CC-2, and other members of the Procurement Network, and Hong Kong, where he currently resides. This demonstrates a significant risk of flight.[3] *See, e.g.*, *United States v. Zarrab*, No. 15 CR 867, 2016 WL 3681423, at *8 (S.D.N.Y. June 16, 2016) (finding pattern of "extensive international travel" and "ties to foreign countries" to "weigh in favor of . . . detention"); *United States v. Routollo*, No. 87 CR 813, 1988 WL 147354, at *3 (E.D.N.Y. Jul. 8, 1988) (finding defendant's frequent travel to the Far East to have increased the likelihood of flight). Indeed, MARCHENKO's ties to Russia and Hong Kong create significant flight risk and irreparable harm upon such flight since the United States cannot secure MARCHENKO's return from either country as the United States does not have an extradition treaty with Russia or Hong Kong. *See United States v. Shuklin,* No. 19-4171, 2020 WL 2992522, at *1 (6th Cir. Mar. 18, 2020) (affirming district court's detention decision which was based, in part, on "strong ties overseas (including in Russia, which does not provide for extradition)" (internal quotation marks and modifications omitted)); *United States v. Kachkar*, 701 F. App'x

---

[3] MARCHENKO does not even need to travel to either jurisdiction: he could enter a diplomatic establishment here in the United States and effectively end his prosecution.

744, 747 (11th Cir. 2017) (finding district court did not err in finding that defendant's "travels to Russia and Libya, which do not have extradition treaties with the United States, and his possession of Russian bank cards and a Russian bank account showed that Kachkar also had 'significant ties and travel to foreign countries' . . . . [and] weighed in favor of a finding that he was a flight risk."); *United States v. Amanat*, 454 F. Supp. 3d 358, 362 (S.D.N.Y. 2020) (finding "international travel" and "substantial connections with Dubai – a country with which the United States does not have an extradition treaty" weighed in favor of detention).

The ties to Russia and Hong Kong are made even more worrisome by MARCHENKO's lack of ties to the community here. To start, MARCHENKO has no ties to the Southern District of New York—the district where he is charged and in which he will be tried—and no known ties to the United States. *See, e.g.*, *United States v. Lewis*, No. 16 Cr. 786 (NSR), 2017 WL 6547742, at *3 (S.D.N.Y. Dec. 20, 2017) (defendant lacked community ties where he had "no contacts with the community of New York," among other factors); *United States v. Lair*, No. 06 Cr. 1068 (CSH), 2007 WL 325776, at *3 (S.D.N.Y. Feb. 2, 2007) (noting that in determining risk of flight the Court must assess "whether the accused will flee from the district in which the indictment has been lodged and his trial will take place").

In cases like this, courts have routinely remanded defendants. *See, e.g., United States v. Lin Feng*, No. 23 MJ 4263 (KMK), Dkt. No. 4 (S.D.N.Y. June 2, 2023) (remanding defendant where there were significant ties to the China and noting that "flight would really completely neuter the Government's ability to prosecute"); *United States v. Sterlingov*, 573 F. Supp. 3d 28, 37–38 (D.D.C. 2021) (finding no combinations of conditions to assure defendant's appearance based in part "lack of meaningful ties to the United States"); *United States v. Xiaorong You,* 2019 WL 2426659, at *4 (E.D. Tenn. June 10, 2019) *(*"The Court cannot ignore defendant's continuing significant foreign ties to her country of origin, including potential access to funds located in a bank in China, which raises a significant concern about her serious risk of flight. Should defendant flee to China, the United States cannot procure her return because there is no extradition treaty with China."); *Zarrab*, 2016 WL 3681423, at *8 ("For purposes of deciding bail or remand, the Court finds most persuasive the following: Defendant's lack of ties to the United States; his significant wealth and his substantial resources; his extensive international travel; and his strong ties to foreign countries, including countries without extradition."); *United States v. Epstein*, 155 F. Supp. 2d 323, 326 (E.D. Pa. 2001) ("The crucial factor, however, is defendant's lack of ties to the United States and his extensive ties to Brazil with which no extradition treaty exists.").

Finally, the risk of flight is heightened by the weight of the evidence here. This case rests on MARCHENKO's own words and recorded deeds: through emails, messages, and consensual recordings, the evidence gathered provides a 360-degree view into the operation of the Procurement Network and MARCHENKO's central role in facilitating the smuggling of sensitive technologies from the United Statse to Russia. It is MARCHENKO's own words and recorded actions that form the basis of the Complaint—evidence that is incontravertible and poses a strong incentive flee, particularly where MARCHENKO is facing penalties of up to ninety-five years in prison. *Zhang*, 55 F.4th at 151 (2d Cir. 2022) ("Where, as here, the evidence against a defendant is strong, it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight."); *United States v. Bruno*, 89 F.

Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong . . . a defendant has stronger motives to flee" (internal quotation marks omitted)).

*Danger to the Community*. As set forth above, MARCHENKO and the Procurement Network fraudulently obtained large quantities of the Micro-Displays for end users in Russia. MARCHENKO's role in the Procurement Network and the Procurement Network's goal of smuggling the Micro-Displays to Russian end users demonstrate the danger MARCHENKO poses to the communityif released pending trial. The U.S. Government has recently determined that such Micro-Displays cannot be exported to Russia because they are military grade microelectronics with military applications and therefore the Micro-Displays are dangerous in the hands of Russian end users. In fact, MARCHENKO himself acknowledged that the Micro-Displays can be used in rifle scopes. That MARCHENKO, CC-1, and CC-2 would so circumvent U.S. laws in order to get these Micro-Displays in the hands of Russian end users undermines the security of all. *See Haig v. Agee*, 453 U.S. 280, 305 (1981) ("[T]he objective of safeguarding our national security is obvious and unarguable." (internal quotation marks omitted)).

### V. ANY PROPOSED BAIL PACKAGE WILL NOT ELIMINATE THE DANGER TO THE COMMUNITY OR THE RISK OF FLIGHT

The Government anticipates that MARCHENKO will propose a bail package that is centered on a secured bond, home confinement, and location monitoring – components that would have limited efficacy in preventing further criminal activity or flight. "Home detention and electronic monitoring" largely operate on the "word" of the defendant that he will be compliant. *United States v. Millan*, 4 F.3d 1038, 1049 (2d Cir. 1993) (internal quotation marks omitted). "[E]lectronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology, and . . . monitoring equipment can be rendered inoperative." *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993) (internal quotation marks omitted). As Judge Rakoff noted, "home confinement, while important, is not enough to prevent someone who is inclined to commit serious criminal acts from continuing down that path." Bond Hearing Tr., at 28, *United States v. Rivera*, 20 Cr. 6 (S.D.N.Y. Mar. 25, 2020). That is particularly true here, where MARCHENKO has demonstrated his willingness to deceive agents of the U.S. government by instructing the UC to lie about the value of the parcels with the Micro-Displays so that the UC would not need to submit an EEI form and also undertake other forms of subterfuge to smuggle goods out of the United States. Such a brazen disregard for U.S. authorities does not inspire confidence that MARCHENKO would abide by any pretrial release conditions. *See United States v. Fishenko*, No. 12 CR 626 SJ, 2013 WL 3934174, at *3 (E.D.N.Y. July 30, 2013), *aff'd* (Sept. 23, 2013) ("Moreover, the Defendant's alleged obstruction of justice indicates his willingness to disregard government orders and, combined with his significant ties to Russia, makes him a significant flight risk if not detained pending trial. Therefore, these factors weigh in favor of detention.")

The other piece of an anticipated bail package is a secured bond but a bond does nothing meaningful to assure the safety of the community. And in any case, it is an imperfect measure to assure MARCHENKO's presence in court. The money that others are willing to put up does not outweigh an incentive for a defendant to flee. The bond simply sets up an easy trade for the defendant: his freedom—and an escape from a long period of incarceration—for the money and property of others. That trade is similar to ones other defendants have made. *See, e.g.*, Bail

Forfeiture Order, *United States v. Ceglia*, 12 Cr. 876 (S.D.N.Y. March 24, 2015), ECF No. 160 (bail forfeiture order entered on a $250,000 bond, secured by four properties and signed by three family members, after defendant cut monitoring bracelet and fled). MARCHENKO's words and deeds inspire no confidence that any proposed bail package would be workable. There is nothing to stop MARCHENKO from continuing to participate in the Procurement Network – as he has done for years – while bailed. Moreover, there is nothing to stop MARCHENKO from continuing to reach out to U.S. companies or communicate with his co-conspirators to continuing working toward the main goal of the Procurement Network – *i.e.*, to fraudulently obtain sensitive U.S. technologies for shipment to Russia.

## VI.   CONCLUSION

The above-proffered evidence is certainly not all of the Government's evidence against MARCHENKO, as a bail hearing is not a "mini-trial" or a "discovery tool for the defendant." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986). But even this should dispel the notion that MARCHENKO can be released on conditions that would reasonably assure his appearance or the safety of the community. Accordingly, for the reasons stated above, the Court should detain the defendant pending trial.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:  /s
Jennifer N. Ong
Shiva H. Logarajah
Assistant United States Attorneys
Southern District of New York
(914) 993-1900

cc:   All Counsel (by email)
      Pretrial Services (by email)