**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States Attorney's Office*
*50 Main Street, Suite 1100*
*White Plains, New York 10601*

July 12, 2024

**BY ECF/EMAIL**
The Honorable Nelson S. Roman
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

**Re: *United States v. Maxim Marchenko,* 24 Cr. 116 (NSR)**

Dear Judge Román:

The Government respectfully submits this letter in advance of the sentencing of the defendant, Maxim Marchenko, scheduled for July 17, 2024. As described below, Marchenko played a primary role in an illicit procurement network responsible for fraudulently obtaining large quantities of dual-use, military grade micro-electronics from U.S. distributors and then smuggling these sensitive technologies to the Russian Federation ("Russia"). For reasons further discussed below, the Government respectfully submits that a sentence within the Guidelines range of 57 to 71 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

## A. The Offense Conduct

### Background

Russia is highly dependent on Western-sourced micro-electronics for its military's hardware, including components manufactured or sold in the United States, because Russia's weapons systems and military platforms—including rocket systems, drones, ballistic missiles, tactical radios, and electronic warfare devices—contain a range of predominantly Western-sourced components and micro-electronics that are critical to their functions. Russia also relies on third-party transshipment hubs and clandestine procurement and payment networks to secure access to such U.S.-sourced electronics. (Compl. ¶ 18).

For years, Maxim Marchenko played a critical role in an illicit procurement network responsible for smuggling sensitive U.S. technologies out of the United States to Russia (the "Procurement Network"). (PSR ¶ 9). Members of the Procurement Network, including Marchenko, arranged for transshipment points to front companies outside of Russia and used the services of a Hong Kong-based freight forwarder (the "Freight Forwarder") to make such shipments. (Compl. ¶ 15(e)). As part of his role in the Procurement Network, Marchenko

maintained, owned, and/or operated several front companies in Hong Kong, including Alice Components Co. Ltd. ("Alice Components"), Neway Technologies Limited ("Neway"), RG Solutions Limited ("RG Solutions"), Namfleg Limited ("Namfleg"), and SSP LTD. (PSR ¶¶ 10, 22, 82). These front companies were all located at, or associated with, the same address on Castle Peak Road in Hong Kong (the "Castle Peak Address"). (PSR ¶ 10 and at 24; Compl. ¶ 23(l)). These front companies were necessary for the Procurement Network to operate as they allowed the network to obfuscate the fact that the sensitive micro-electronics it obtained were destined for Russia. (PSR ¶ 10). Between about May 2022 and August 2023, Marchenko's front companies funneled a total of more than 1.6 million U.S. dollars to the United States in support of the Procurement Network's efforts to smuggle certain micro-displays to Russia. (Compl. ¶ 15(f)).

Marchenko worked with two co-conspirators ("CC-1" and "CC-2"), who are both members of the Procurement Network and who both have extensive ties to Russia and sanctioned entities in Russia.

CC-1 is a Russian national who works for Infotechnika, a Russia-based electronics seller that used the Freight Forwarder to ship goods to Russia. Infotechnika shared a physical address with NPO Electronic Systems, a Russian electronics reseller. In or about March 2022, following Russia's invasion of Ukraine, NPO Systems was placed on the "Entity List" [1] for having been involved in, contributed to, or otherwise supported the Russian security services, military and defense sectors, and military and/or defense research and development efforts. In addition, Infotechnika shares an IP address and phone number with OOO NPTC Topaz, a/k/a "NPC Topaz," another Russia-based company. (Compl. ¶ 16(c)).

CC-2 is a Russian national who is the director at NPC Topaz and the supervisor of CC-1. CC-2 is also a 25% shareholder of NPC Granat, a Russian company in the electronics production industry. In or about September 2016, NPC Granat was placed on the Entity List after it was identified as operating in Russia's arms or related material sector. *See* Exec. Order 13661; 81 Fed. Reg. 61595. (Compl. ¶ 16(f)).

<u>The Procurement Network Before February 2022</u>

Since at least October 2014, the Procurement Network used companies located in Russia, such as Radiofid Systems ("Radiofid"), to purchase thousands of military-grade OLED micro-displays manufactured by an American company based in Dutchess County, New York ("Company-1" and the "Micro-Displays"). (PSR ¶¶ 11-12). These Micro-Displays have civilian applications and military applications, such as in rifle scopes, night-vision goggles, thermal optics, and other weapon systems. (PSR ¶ 9). The Procurement Network obtained these Micro-Displays on behalf of end users in Russia, such as Emercom Russia, a Russia state-owned civil defense organization, and Company-1 internally classified Radiofid's orders of Micro-Displays in 2020 and 2021 as "Military." (PSR ¶¶ 11-12).

[1] The Entity List is a U.S. Government list of foreign persons and entities believed to be involved in activities contrary to U.S. national security or foreign policy interests and who are subject to specific export license requirements. *See* 15 C.F.R. § 744.16; 15 C.F.R. Part 774, Supp. 4 (Entity List); *see generally* Entity List, Bureau of Industry and Security, https://perma.cc/CEZ3-QYZA.

Marchenko, CC-1, and CC-2 were all involved in Radiofid's orders of Micro-Displays. (PSR ¶ 9; Compl. ¶ 20). For example, at least some of the Radiofid orders of Micro-Displays, which were destined for Russia, were shipped directly to Marchenko at the Castle Peak Address. In addition, Marchenko used Neway to pay for some of the Radiofid orders. (PSR ¶ 12). Moreover, Marchenko communicated with CC-1 and CC-2 regarding these orders, and Marchenko even sent a message to CC-1 about not using the word "ELECTRONIC COMPONENTS" to avoid sanctions on the advice of a vice president of a foreign bank. (Compl. ¶ 18(c)).

The Procurement Network *After* Russia's Invasion of Ukraine

Following Russia's invasion of Ukraine in February 2022[2], Company-1 decided that "it [wa]s no longer right for [Company-1] to sell or ship to Russian customers and risk that [its] displays"—*i.e.*, the Micro-Displays—would "be used in devices that could put US or NATO forces in harm's way, or support Russia's unlawful invasion of Ukraine and its human rights abuse." (PSR ¶ 13). In other words, Company-1 would no longer sell Micro-Displays to Radiofid—a Russian company who shipped Micro-Displays to Russian end users. In or about May 2022, a Company-1 representative explained to Radiofid that business between the United States and Russia was on hold, and Company-1 needed to wait for the situation to resolve before it resumed shipping Micro-Displays to Russia. (Compl. ¶ 21(b)).

Therefore, the Procurement Network devised a cover story—or "legend" as CC-1 called it—to continue purchasing Micro-Displays from Company-1. (PSR ¶ 14). Specifically, the network began using one of Marchenko's front companies—Alice Components—to conceal the fact that they were purchasing Micro-Displays on behalf of end users in Russia. (*Id.*). As part of this "legend," CC-1 posed as "Amy Chan," the purchase manager for Alice Components, to communicate with Company-1 representatives. (*Id.*)

In June 2022, Alice Components placed its first order with Company-1 for 500 Micro-Displays for approximately $292,050 (the "June Order"). (PSR ¶ 15). CC-1 (posing as Amy) falsely represented on a presales questionnaire to Company-1 that Alice Components wanted to purchase 3,000 to 5,000 Micro-Displays annually to be used in "electron microscopes" for "medical research" and listed the end-user countries as China, Hong Kong, Malaysia, and Europe. (PSR ¶ 16). The pre-sales questionnaire also certified that the facts in the questionnaire were true and that the Micro-Displays would not be used "for any purpose or [sent] to any end user contrary to the representations made." (Compl. ¶ 22(b)).

These Micro-Displays, however, were actually destined for end users in Russia. That same month, in June 2022, Marchenko received a contract for RG Solutions to sell electronic components to a Russian company, MEC LLC. (PSR ¶ 15). Additionally, prior to Alice Components paying Company-1 for the June Order, CC-1 messaged Marchenko: "Hi. Today I sent you 58 ( your [sic] orders) and 292 ( to [sic] pay for displays with RG), I think the bank will pay for the week." (Compl. ¶ 22(i)). Shortly thereafter, NPC Topaz (where CC-2 is a director) sent

[2] David Leonhardt, *War in Ukraine*, NEW YORK TIMES, Feb. 24, 2022, available at https://www.nytimes.com/2022/02/24/briefing/ukraine-russia-invasion-putin.html.

two wires to RG Solutions for a total of about $292,000—*i.e.*, the approximate price of the June Order. (*Id.*). Both wires referenced the contract between RG Solutions and MEC LLC. (*Id.*). Thereafter, Marchenko sent CC-2 messages about actions the United State had taken against Chinese companies that violated sanctions by supporting the Russian defense apparatus. CC-2 responded: "So we'll be even more careful." (Compl. ¶ 24(b)).

Company-1 shipped the Micro-Displays from the June Order on June 30 and August 4, 2022. (PSR ¶ 17). Based on the misinformation provided by CC-1 (posing as Amy) on behalf of Alice Components, Company-1 filed an Electronic Export Information ("EEI") for each shipment that contained false statements.[3] (PSR ¶ 18). First, the EEIs falsely stated that the ultimate consignee for the June Order was the Freight Forwarder. (*Id.*). Second, the EEIs falsely state that the Micro-Displays were destined for Hong Kong—not Russia or a Russian end user. (*Id.*).

In August 2022, CC-1 (posing as Amy) tried to order an additional 2,000 Micro-Displays from Company-1 under the guise that the Micro-Displays would be used for medical research outside of Russia (the "August Order"). (PSR ¶ 19). For example, when a Company-1 representative asked CC-1 (posing as Amy) to confirm that neither Russia nor Ukraine was the end country, CC-1 (despite knowing that the Micro-Displays were destined for Russia) continued to lie to Company-1 and replied: "I confirm that this does not include Russia or Ukraine for end country." (*Id.*). CC-1 (posing as Amy) again submitted a presales questionnaire that contained the same falsehoods as the prior questionnaire but now identified the end user as the National Health Commission of the People's Republic of China—another lie. (*Id.*). Thereafter, Company-1 issued an invoice to Alice Components, and CC-1 later forwarded this invoice to Marchenko and told Marchenko that it was "obligatory" that payment came from RG Solutions. (Compl. ¶ 22(m), (n)).

Ultimately, Company-1 did not fulfill the August Order and instead referred Alice Components to an undercover company controlled by law enforcement (the "UC Company"), which Company-1 described as a distributor of Company-1's Micro-Displays. (PSR ¶ 20).

<u>The Procurement Network's Efforts to Fraudulently Obtain Micro-Displays with the UC Company</u>

In November 2022, after Company-1 refused to continue selling Micro-Displays to the Procurement Network through Radiofid and Alice Components, the Procurement Network turned to the UC Company to continue purchasing the Micro-Displays on behalf of Russian end users. (PSR ¶ 21). Alice Components initially ordered 50 Micro-Displays from Company-1 (the "November Order"). (*Id.*). As with its prior orders, Alice Components, through CC-1 (posing as Amy), falsely represented to the UC Company that the Micro-Displays would be used in electron microscopes for medical research in the National Health Commission for the People's Republic of China. (*Id.*).

[3] An exporter must file an EEI when the value of a commodity being exported classified under each individual Schedule-B number (a type of classification code) is over $2,5000 or if a validated export license is required to export the commodity regardless of value. 15 C.F.R. § 758.1(b).

To further conceal the fact that these Micro-Displays were actually destined for Russian end users, and to maintain the Procurement Network's cover story or "legend," CC-1 told Marchenko to pay for this initial order using RG Solutions. (PSR ¶ 22). CC-1 further advised Marchenko that he could not use Neway to pay for this initial order because Marchenko used Neway to pay for Russia-based Radiofid's orders from Company-1 prior to Russia's invasion of Ukraine. (*Id.*). Therefore, in order to protect the Procurement Network's cover story, Marchenko used Namfleg to pay the UC Company for the November Order. (PSR ¶ 23). After the UC Company shipped the November Order, multiple IP addresses connected to NPC Granat—a Russia-based electronics company on the Entity List—checked the tracking information for the shipment, further indicating that the Micro-Displays were intended for Russian end users rather than the National Health Commission of the People's Republic of China. (*Id.*).

The next month, in December 2022, Alice Components, through CC-1, purchased an additional 2,450 Micro-Displays from the UC Company for approximately $1,594,000 (the "December Order"). (PSR ¶ 24). Following the December Order, CC-2 told Marchenko he would "start sending $1.6 million to pay [Company-1]" and then the two discussed how CC-2 would send the money to Marchenko's front company, SSP LTD. (PSR ¶ 24; Compl. ¶ 23(f)). Around this time, on or about December 16, 2022, Marchenko sent CC-2 a link to an article titled, "The supply chain that keeps tech flowing to Russia."[4] That article discussed how, despite U.S. export restrictions against Russia, especially restrictions on sensitive technology following Russia's invasion of Ukraine, the global supply chain continued to feed Russia with Western computer components and other electronics by shipping them through other locations like Hong Kong. (Compl. ¶ 18(c)).

Between December 2022 and February 2023, Marchenko's front companies, including Namfleg, RG Solutions, and SSP LTD, made fourteen separate wire transfers for a total of approximately $1,333,294.85 from Hong Kong-based accounts to the UC Company's bank account located in Manhattan, New York. (PSR ¶ 25). In February 2023, the UC Company shipped about 700 of the Micro-Displays from the December Order. (*Id.*). Thereafter, multiple IP addresses associated with NPC Granat (a Russian company on the Entity List) again checked the tracking information for the shipment. (*Id.*).

On or about March 4, 2023, an undercover law enforcement agent posing as an employee of the UC Company (the "UC") informed CC-1 (posing as Amy) that the U.S. Department of Commerce ("Department of Commerce") had detained the shipment of 700 Micro-Displays because of a concern that it would be diverted to prohibited end users in Russia. (PSR ¶ 26). Two days later, CC-1 messaged Marchenko the UC's name and phone number. (*Id.*). That same day, Marchenko called the UC, which the UC recorded. (*Id.*). During the call, Marchenko identified himself as "Maxim" from "Alice Components" and stated that he worked with "Amy" – a reference to CC-1's fictitious persona. (PSR ¶ 27). Marchenko then falsely explained that payment for Alice Components' orders was coming from a third party because Marchenko's bank accounts were being closed. (*Id.*). Marchenko knew that this representation was false because he and other members of the Procurement Network, including CC-1 and CC-2, discussed using his

[4] https://www.reuters.com/investigates/special-report/ukraine-crisis-russia-tech-middlemen/.

Hong Kong-based front companies to obfuscate the fact that payment for the Micro-Displays came from Russia. (*Id.*).

After the Department of Commerce released the detained shipment in or about July 2023, the UC informed CC-1 that the UC Company was in possession of the Micro-Displays. (PSR ¶ 28). On August 14, 2023, the UC and Marchenko exchanged several messages about the Micro-Displays. In particular, Marchenko asked the UC if the UC could "send low value parcel by USPS" and "make value below 2500usd"—*i.e.*, the threshold value for when an EEI must be submitted. (*Id.*). When the UC expressed some concern with this plan, Marchenko responded that there was "less risk" and he had "do[ne] before." (*Id.*). In fact, when the UC asked who to put on the end user form, Marchenko demonstrated his understanding of federal commerce regulations and requirements when he responded: "below 2500usd no need." (*Id.*). In other words, Marchenko tried to coerce the UC to help him circumvent the EEI filing requirements, and thus avoid reporting the true destination of these goods (Russia), by misrepresenting the value of the Micro-Displays. (*Id.*).

Shortly thereafter, the UC offered to hand deliver the Micro-Displays to Marchenko and suggested meeting in a third country ("Country-1"). (PSR ¶ 29). Before agreeing to meet the UC in Country-1, Marchenko told the UC he would need to check the "customs regulation" of Country-1. (*Id.*). After determining that he thought "nobody will check there," Marchenko agreed to meet the UC in Country-1 and immediately began looking up flight options from Hong Kong to Country-1. (*Id.*).

On or about September 17, 2023, at an agreed upon place and time, Marchenko and another individual ("CC-3") met the UC in Country-1 for the purpose of picking up the 2,450 Micro-Displays that Alice Components had ordered. (PSR ¶ 30). During the meeting, in substance and in part, Marchenko stated that (i) the Micro-Displays are used in hunting rifles—another lie; (ii) Alice Components would give the UC Company a contract for Alice Components to purchase an additional 7,500 Micro-Displays (which CC-1 had previously discussed with the UC); and (iii) he had created bank accounts and businesses in Switzerland to facilitate the Procurement Network's operations. (PSR ¶ 31).

In addition, Marchenko did not deny that CC-1 was located in Russia when CC-1 was communicating with the UC, and Marchenko identified additional parts that he wanted to purchase through the UC Company. (PSR ¶ 31). At one point during the meeting, the UC told Marchenko that he/she was worried that the Micro-Displays would be found in weapons on battlefields in Ukraine and that serial numbers would connect the Micro-Displays to the UC Company. (PSR ¶ 32). Marchenko denied that the parts were going to Ukraine and replied, in substance and in part, that lasers were available so they could take care of the serial numbers. (PSR ¶ 33). The UC also told Marchenko that Alice Components could not continue using the lie that the end user of the Micro-Displays was the National Health Commission of the People's Republic of China. (*Id.*). Marchenko replied, in substance and in part, that they (the Procurement Network) had different end users that they could use. (PSR ¶ 34). The UC also stated that he/she was willing to hand deliver Micro-Displays for future orders and suggested that Marchenko meet the UC or his/her representatives in third countries to pick up the Micro-Displays. CC-3 stated that she could meet the UC to pick up future orders.

[redacted]

[redacted]

## B. Procedural History

On August 25, 2023, the defendant was charged in a seven-count Complaint with (i) conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; (ii) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); (iii) conspiracy to smuggle goods from the United States, in violation of 18 U.S.C. § 371; (iv) promotional money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2; (v) smuggling goods from the United States, in violation of 18 U.S.C. §§ 554 and 2; (vi) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; and (vii) wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. (Dkt. No. 2).

[redacted]

On September 18, 2023, Marchenko was presented before the Honorable Andrew E. Krause and detained on consent. (Dkt. No. 5). Marchenko has been detained since that time.

On February 29, 2024, Marchenko pled guilty before the Honorable Victoria Reznik pursuant to a plea agreement. Marchenko pled guilty to a two-count information charging him with (i) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and (ii) smuggling goods from the United States, in violation of 18 U.S.C. §§ 554 and 2. (Dkt. No. 20). On April 22, 2024, Your Honor issued an order accepting Marchenko's guilty plea. (Dkt. No. 28).

## C. The Plea Agreement and the Applicable Guidelines Range

The plea agreement between the Government and the defendant sets forth the parties' understanding of the appropriate offense level under the U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines"). Pursuant to U.S.S.G. § 2S1.1, Application Note 6, and U.S.S.G. 3D1.2(C), Counts One and Two are grouped together (the "Group") because the defendant is pleading guilty to a count of laundering funds and a count for the underlying offense from which the laundered funds are derived. Additionally, pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to the Group is the highest offense level, which, in this case, is U.S.S.G. § 2S1.1—the offense level applicable to Count One. (PSR ¶ 6(b)).

The offense level for Count One is 25 and is calculated as follows: the base offense level is 26 because this offense involved the evasion of national security controls, pursuant to U.S.S.G. §§ 2S1.1(a)(1), 2M5.1; two levels are added because the defendant is pleading guilty to violating 18 U.S.C. § 1956, pursuant to U.S.S.G. § 2S1.1(b)(2)(B); two levels are added because the offense involved sophisticated laundering and U.S.S.G. § 2S1.1(b)(2)(B) applies, pursuant to U.S.S.G. § 2S1.1(b)(3); three levels are subtracted because the defendant timely accepted responsibility, pursuant to U.S.S.G. § 3E1.1(a), (b); and two levels are subtracted because the defendant has no criminal history points and meets the criteria of U.S.S.G. § 4C1.1(a). (PSR ¶ 6). The defendant has zero criminal history points and is in Criminal History Category I. (PSR ¶ 6(l)).

Based on an offense level of 25 and Criminal History Category of I, the Guidelines range is 57 to 71 months' imprisonment. (PSR ¶ 6(m)).

The United States Probation Office (the "Probation Office") calculated the same Guidelines range. (PSR ¶¶ 41-53, 56, 92). The Probation Office recommends a sentence of 57 months' imprisonment. (PSR at 27). In support of its recommendation, the Probation Office reported that punishment and deterrence were the "two pressing sentencing objects" that underlie its recommendation. (PSR at 28). In addition, the Probation Office acknowledged that the defendant used "sophisticated laundering" and stated that it did not consider a lesser sentence "due to the seriousness of the offense which could have caused significant risk to the U.S. or other nations had the military grade micro displays successfully shipped to Russia." (*Id.*). In addition, the Probation Office noted that Marchenko "reported owning two of the companies involved in the offense conduct," which both continue to operate. (*Id.*). The Probation Office also considered Marchenko's mitigating factors, such as his medical conditions, his family, and the fact that the instant offense represents his first criminal conviction. (*Id.*).

## D. Applicable Law

The Sentencing Guidelines continue to provide important guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Though they are advisory and not mandatory, the Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall v. United States*, 552 U.S. 38, 46 (2007). It follows that district courts should treat the Sentencing Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49; *see also Booker*, 543 U.S. at 264

(explaining that district courts must "consult" the Sentencing Guidelines and "take them into account" when sentencing). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall*, 552 U.S. at 49.

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant;
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

**E. A Sentence Within the Guidelines Range of 57 to 71 Months' Imprisonment Is Appropriate in This Case**

The Government respectfully submits that a sentence within the Guidelines range of 57 to 71 months' imprisonment is sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing. As further discussed below, the Government submits that a sentence within the Guidelines range is necessary to, among other things, reflect the seriousness of the offense, promote respect for the law, protect the public, and ensure adequate deterrence.

1. <u>The Nature and Circumstances of the Offense, the Seriousness of the Offense, and the Need for Just Punishment Warrant a Guidelines Sentence</u>

As a threshold matter, following Russia's invasion of Ukraine, the Department of Commerce's Bureau of Industry and Security ("BIS") imposed a series of stringent export controls aimed at restricting Russia's access to technologies and other items it needed to sustain its attack on Ukraine. *See, e.g.*, 87 Fed. Reg. 12856; 87 Fed. Reg. 22130; 28 Fed. Reg. 28758. As of May 2022, the Micro-Displays at issue here were classified as "EAR99" meaning that, in general, a license is not required to export these items to Russia unless—as is the case here—the Micro-Displays are destined for a prohibited end use or a prohibited end user, like an end user on the BIS

Entity List. When the BIS expanded the scope of items subject to the more stringent licensing requirements in May 2022, it explained that its actions "further[ed] international coordination in response to Russia's brutal and illegal invasion of Ukraine" and would "further deprive Russia's government of additional tools, equipment, and resources it needs to support activities that generate revenues that sustain its military aggression."[5]

Against this backdrop, there is no doubt that Marchenko's work with the Procurement Network was serious as it involved the evasion of national security controls to fraudulently obtain sensitive, military-grade micro-electronics for end users in Russia to use in Russia's war against Ukraine. Marchenko was essential to the Procurement Network not only because he operated the front companies that were used to source and purchase the Micro-Displays but also because these front companies were necessary to conceal the fact that the U.S. micro-electronics were destined for Russia. Indeed, Marchenko admitted to owning and operating Neway and RG Solutions—two of the front companies that helped purchase Micro-Displays from Company-1 and the UC Company for Russian end users. (PSR ¶ 82).

Moreover, Marchenko actively helped the Procurement Network evade U.S. export laws by peddling lie after lie to Company-1, the UC Company, and ultimately the U.S. Government. For example, Marchenko used RG Solutions (an import/export electronics trading and manufacturing company he has admittedly owned and operated since 2008) to pay Company-1 for the Micro-Displays so that prior Procurement Network orders would not be connected to Alice Components. In other words, to hide the fact that the Micro-Displays would be delivered to Russia for military applications as the Procurement Network had done in the past. Additionally, in August 2023, Marchenko exchanged several messages with the UC regarding the UC Company sending the Micro-Displays to Marchenko:

| | |
|---|---|
| MARCHENKO: | can you send low value parcel by USPS |
| MARCHENKO: | make value below 2500usd |
| UC: | This is over a million dollars worth of product. Are you sure that is a good idea? |
| MARCHENKO: | less risk |
| MARCHENKO: | do before |
| MARCHENKO: | split for few parcel |

* * *

[5] U.S. Dep't of Commerce, Bureau of Industry and Security, Commerce Increases Restrictions on U.S. Exports to Russian Industrial and Commercial Sectors, May 9, 2022, available at https://www.bis.doc.gov/index.php/documents/about-bis/newsroom/press-releases/2986-2022-05-09-bis-press-release-commerce-increases-restrictions-on-u-s-exports-to-russia/file; *see also* 87 Fed. Reg. 28,758.

| | |
|---|---|
| UC: | I think multiple shipment creates more risk. I can put a paid invoice in the box for a lower amount like you said. Who did you put on the end user form? |
| MARCHENKO: | below 2500usd no need |

(Compl. ¶ 23(o)). By instructing the UC to lie about the value of the parcels, Marchenko was trying to circumvent EEI filing requirements and thus avoid reporting the true destination of the Micro-Displays (Russia). Marchenko additionally lied to the UC and told the UC that the Micro-Displays were being used in hunting rifles.[6]

Marchenko and the Procurement Network were prepared to go even further. For example, Marchenko advised the UC that (i) he had other end users that the Procurement Network could use when the UC informed him that they could not continue to use the National Health Commission of the People's Republic of China as the purported end user; (ii) Marchenko created additional bank accounts and business in other countries for the Procurement Network; and (iii) the Procurement Network was prepared to erase the serial numbers on the Micro-Displays—a further display of the lengths that Marchenko and the Procurement Network were willing to go to further the goals of their sophisticated global procurement scheme. The reason for all of Marchenko's lies and everchanging stories about the use and destination of Micro-Displays is clear: Marchenko knew these Micro-Displays were going to Russia. In fact, the U.S. Department of Defense actually recovered a rifle scope from the battlefield in Ukraine that contained a Radiofid-purchased Micro-Display.

What makes Marchenko's conduct especially concerning is the fact that the Procurement Network had fraudulently obtained sensitive U.S. technology for Russia before. For example, when Marchenko told the UC to lie about the value of the Micro-Displays to avoid filing an EEI, Marchenko said that he had done this before. (Compl. ¶ 23(o)). Moreover, the Procurement Network sought to obtain tens of thousands of Micro-Displays from the UC Company as indicated on the presales questionnaire, in communications between CC-1 and Marchenko, and Marchenko's statement to the UC that Alice Components would give the UC Company a contract to purchase an additional 7,500 Micro-Displays. Had these orders of Micro-Displays not been interdicted by law enforcement, Russia would have been armed with thousands of units of military-grade technologies that had the potential to cause widespread harm to U.S. national security interests.

While Marchenko has pleaded guilty and admitted to the core offense conduct in his allocution, he nevertheless spends much of his sentencing submission minimizing his own involvement and downplaying the seriousness of his actions. (Def. Mem. at 9). In particular, Marchenko argues that his conduct was not "prohibited per se" and that he was "openly, transparently, and lawfully" exporting the Micro-Displays to Russia "for years." (Def. Mem. at 9-

[6] On or about March 16, 2023, Politico reported that China shipped 1,000 assault rifles, categorized as "civilian hunting rifles," to Russia between June and December 2022. *See* https://www.politico.com/news/2023/03/16/chinese-rifles-body-armor-russia-ukraine-00087398.

10). Marchenko tries to argue that "what changed" was Company-1 "decid[ing], on its own, that it no longer wanted to sell its products to Russian customers or customers who shipped their products to Russia." (*Id.*). That is plainly wrong. What changed was (1) Russia's invasion of Ukraine, (2) the BIS expanding the scope of items subject to more stringent license requirements in May 2022, and (3) the Procurement Network's repeated lies to avoid informing Company-1, the UC Company, and ultimately the U.S. Government that the Micro-Displays were going to Russia. *See* 87 Fed. Reg. 28,758.

Moreover, it is clear that it was not Company-1's decision that made Marchenko's conduct illegal—rather, it was Marchenko and the Procurement Network efforts to circumvent U.S. laws to fraudulently obtain the Micro-Displays. For example, Marchenko and the Procurement Network repeatedly lied about how the Micro-Displays would be used and where they were going. They falsely stated that (i) the Micro-Displays were going to be used in "electron microscopes" for "medical research" outside of Russia; (ii) the end user was the National Health Commission of the People's Republic of China; (iii) neither Russia nor Ukraine was an end country; and (iv) the Micro-Displays were going to be used in hunting rifles. Marchenko and the Procurement Network knew that these statements were lies. For example, in March 2023, the same day that Marchenko reached out to the UC about the Department of Commerce detaining their shipment of Micro-Displays, CC-1 bluntly told Marchenko: "We support the legend that we are Alice Components and we know nothing about Russia." In other words, CC-1 was expressing CC-1's commitment to the Procurement Network's cover story in light of U.S. Government scrutiny of the Procurement Network's efforts to smuggle sensitive technologies to Russia. (Compl. ¶ 24(e)).

Marchenko and the Procurement Network were also prepared to take additional steps to hide the true use of the Micro-Displays: (i) Marchenko told the UC to lie about the value of the Micro-Displays so that the UC could ship them without filing an EEI (and therefore avoid the end user reporting requirement); (ii) Marchenko advised the UC that the Procurement Network had lasers to erase serial numbers; (iii) Marchenko had additional companies and bank accounts in other countries for the Procurement Network to use; and (iv) Marchenko and the Procurement Network had other end users that it could list on the forms aside from the National Health Commission of the People's Republic of China. Marchenko and the Procurement Network repeatedly lied because they were trying to hide that the Micro-Displays were destined for Russia.

Marchenko also attempts to minimize his conduct by arguing that he "played a limited role as an intermediary in the transaction." (Def. Mem. at 10). As set forth in more detail above, Marchenko was more than a middleman or intermediary, and he played a large role in the Procurement Network: Marchenko actually procured the contraband, he made false statements to U.S. suppliers and advised the UC how to avoid certain reporting requirements, he transferred money to U.S. suppliers, he reaped the profits of illegally exporting the Micro-Displays and other sensitive technology, and arranged for the Micro-Displays to be exported. Moreover, Marchenko communicated directly with the UC to secure the Micro-Displays from the UC Company—he exchanged text messages, had phone calls, and even met the UC in person in a third-party country. Furthermore, Marchenko owned, operated, or maintained multiple front companies—*e.g.*, Neway, RG Solutions, SSP LTD, Namfleg, and Alice Components—that were necessary for the Procurement Network to conceal the fact that the Micro-Displays were going to Russia.

At bottom, these facts demonstrate that Marchenko's conduct was not only serious, particularly as it relates to the national security interests of the United States, but also displays a level of sophistication and great deal of effort for concealing the movement of money and Micro-Displays to be illegally exported outside the United States. This egregious conduct, therefore, favors a sentence within the Guidelines range of 57 to 71 months' imprisonment to reflect the nature and circumstances of the offense, to reflect the seriousness of the offense, and to provide just punishment.

2. Marchenko's History and Characteristics and the Need for Specific Deterrence Weigh in Favor of a Guidelines Sentence

Marchenko made hundreds of thousands of dollars working with the Procurement Network and fraudulently funneling sensitive U.S. technologies to Russia in direct contravention of U.S. law. Marchenko admitted to owning and operating two of the Procurement Network's front companies: Neway and RG Solutions, which he described as "import and export electronics trading and manufacturing companies." (PSR ¶ 82). According to Marchenko, the companies brought in approximately $40 million U.S. dollars annually. (*Id.*). Marchenko additionally reported receiving a salary of $300,000 annually, which includes receiving a commission for the sale of electronics devices for which his company was responsible for trading or manufacturing and importing/export. (PSR ¶¶ 82, 87 n.4). In other words, Marchenko made five times as much as he did in his prior employment at Virtual Technologies and more than ten times as much as he made working at Panasonic. After Marchenko is released, he will certainly be tempted to participate in similar conduct again, especially given the potentially lucrative returns. Both Neway and RG Solutions are currently in operation despite Marchenko's incarceration, and it is concerning that both companies are still operating despite their connections to the Procurement Network and illegally activity. A substantial sentence is needed to discourage Marchenko from continuing to operate Neway, RG Solutions, and his other front companies and resuming the Procurement Network's scheme of smuggling technology to Russia once he is released.

The Government acknowledges that Marchenko does not have a criminal history—although the Probation Office is not privy to any potential violations he may have committed in Russia, Hong Kong, or elsewhere. While this is notable, the conduct in this case would have continued unabated had it not been for law enforcement's intervention. The Government, therefore, believes that despite Marchenko's lack of criminal history, this fact must be balanced against the seriousness of the offense, the nature and circumstances of the offense, and the need for adequate deterrence—all of which favor a sentence within the Guidelines Range of 57 to 71 months' imprisonment.

3. The Need for General Deterrence, to Promote Respect for the Law, and to Protect the Public Weighs in Favor of a Guidelines Sentence of 57 to 71 Months' Imprisonment

Russia relies heavily on components, electronics, and technology from the United States and Western countries to fuel its military industrial complex.[7] Despite export controls levied

---

[7] Amy MackInnon, *Russia's War Machine Runs on Western Parts*, Foreign Policy Magazine, Feb. 22, 2024, available at https://foreignpolicy.com/2024/02/22/russia-sanctions-weapons-ukraine-

against Russia in the aftermath of its invasion of Ukraine, advanced electronics and machinery have continued to flow into Russia "as new and convoluted supply chains have been forged through third countries" courtesy of expansive procurement network designed to circumvent these export controls, such as the Procurement Network.[8] Cutting off Russia's access to such components is necessary to protect U.S. national security interests and stem the flow of these parts to Russia for use in its weapons. Unfortunately, Marchenko is not the only person, and the Procurement Network is not the only network, supplying Russia with the military-grade electronics that it seeks.[9] Indeed, while law enforcement's investigation in this matter led to the arrest of Marchenko, CC-1 and CC-2 remain at large and both Neway and RG Solutions are still operating. (PSR ¶ 82).

And, as Marchenko reported, evading U.S. export laws to supply Russia with micro-electronics can be lucrative, and the stringent licensing requirements on exporting certain sensitive electronics, such as the Micro-Displays, made these products substantially more valuable when they crossed the United States' borders—particularly because the Micro-Displays have military applications. Thus, individuals (like Marchenko and his co-conspirators) can make a substantial amount of money—as Marchenko did—by selling these high tech military-grade items in Russia in flat contradiction to U.S. laws. Indeed, the seriousness of this offense is why the Government sought to arrest Marchenko after he was expelled from Country-1 in the first instance. The Government, therefore, respectfully submits that a Guideline sentence is warranted in this case to send the appropriate message not only to Marchenko (who may consider resuming the operation

---

war-military-semiconductors/; Matt Loh, *Nearly half of Russia's imported battlefield tech has been coming from US and EU companies: joint report*, Business Insider, Jan. 12, 2024, available at https://www.businessinsider.com/half-russia-imported-military-technology-us-eu-companies-ukraine-2024-1?amp (reporting that "advanced tech imported by the Kremlin in those months is valued at $8.77 billion").

[8] *Id.*; *see, e.g.*, Karen Freifeld, *US takes another step to stem the flow of technology to Russia for weapons*, Reuters, Apr. 1, 2024, available at https://www.reuters.com/world/us-takes-another-step-stem-flow-technology-russia-weapons-2024-03-29/; Chairman Richard Blumenthal, Hearing on "The U.S. Technology Fueling Russia's War in Ukraine: How and Why," Feb. 27, 2024, available at https://www.hsgac.senate.gov/wp-content/uploads/Opening-Statement-Chairman-Blumenthal-Feb.-27-2024.pdf ("Russia's success in its efforts to evade export controls can be seen in the very weapons recovered on the battlefield.").

[9] *See, e.g.*, *President of Freight Forwarding Company Indicted for Allegedly Smuggling Goods from the United States to Russia*, Dep't of Justice, July 2, 2024, available at https://www.justice.gov/opa/pr/president-freight-forwarding-company-indicted-allegedly-smuggling-goods-united-states-russia; *Four Arrested and Multiple Russian Nationals Charged in Connection with Two Schemes to Evade Sanctions and Send U.S. Technology Used in Weapons Systems to Russia*, Dep't of Justice, Nov. 1, 2023, available at https://www.justice.gov/opa/pr/four-arrested-and-multiple-russian-nationals-charged-connection-two-schemes-evade-sanctions; *Russian-German National Arrested For Illegally Exporting To Russia Sensitive U.S.-Sourced Microelectronics With Military Applications In Violation Of U.S. Export Controls*, Dep't of Justice, Aug. 31, 2023, available at https://www.justice.gov/usao-sdny/pr/russian-german-national-arrested-illegally-exporting-russia-sensitive-us-sourced.

of his front companies) but also other individuals who are observing this case and contemplating similar illegal acts.[10]

Furthermore, the importance of adequately deterring others from fraudulently procuring military grade technologies in violation of U.S. laws is particularly acute. As a result of the significant resources required to mount such a prosecution combined with the fact that many individuals involved in these procurement networks live outside of the United States, such prosecutions are relatively rare; and where the incident of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence.

4. Marchenko's Proposed Sentence of 10 Months is Wholly Inadequate.

For his part, the defendant seeks a sentence of about 10 months (time served). (Def. Mem. at 2). Marchenko principally argues for this below-Guidelines sentence by claiming that he played a "limited role as a middleman" and arguing that exporting the Micro-Displays to Russia is not *per se* illegal, the Guidelines range overstates the seriousness of the offense, similarly situated defendants have received below-Guidelines sentences, and further incarceration will not promote deterrence. (*Id.* at 9-16).

Marchenko's arguments that his Guidelines range overstates the seriousness of the offense are misplaced. Marchenko cites *United States v. Sotis*, 89 F.4th 862, 879-80 (11th Cir. 2023), for his proposition that U.S.S.G. § 2M5.1 "sweep extraordinarily broadly, to include any offense involving any item subject to the [EAR]." (Def. Mem. at 13). However, the Eleventh Circuit, quoting the Sentencing Commission, stated that "the additional reference to § 2M5.1 promotes clarity and consistency in guideline application, and the penalty structure of § 2M5.1 *provides appropriate distinctions* between offenses that violate national security controls and offenses that do not." *Sotis*, 89 F.4 at 879 (emphasis added) (quoting United States Sentencing Guidelines Manual, supp. to app. C, amend. 777 (Nov. 2013)). The Eleventh Circuit continued: "The EAR, as reauthorized by the President under the IEEPA, is clearly a system of 'national security controls.'" *Id.; see* 15 C.F.R. § 730.6 (explaining that the EAR is "intended to serve the national security, foreign policy, nonproliferation of weapons of mass destruction, and other interests of the United States"). Moreover, Marchenko argues the sophisticated laundering enhancement

---

[10] A quick Google search of Marchenko's case reveals that it has attracted substantial press coverage, particularly overseas. Accordingly, general deterrence is a legitimate concern here. *See, e.g.*, The Moscow Times, *Russian Man Admits to Smuggling Military-Grade Electronics From U.S.*, , Mar. 1, 2024, available at https://www.themoscowtimes.com/2024/03/01/russian-man-admits-to-smuggling-military-grade-electronics-from-us-a84300; Reuters, *Russian Who Smuggled Military Technology Pleads Guilty In U.S. Court*, Feb. 29, 2024, available at https://www.rferl.org/a/us-russia-military-tech-smuggling/32842951.html; The Times of India, *Russian guilty of smuggling military-grade electronics from US*, Mar. 1, 2024, available at https://timesofindia.indiatimes.com/world/rest-of-world/russian-man-pleads-guilty-to-smuggling-military-grade-electronics-from-us/articleshow/108130623.cms.

"likely applies in every money laundering case." (Def. Mem. at 13). This is simply not true. The Sentencing Guidelines defines sophisticated laundering as involving "complex or intricate offense conduct," which typically involves fictitious entities, shell corporation, layering, and offshore accounts—circumstances that are not present in every money laundering case. U.S.S.G. § 2S1.1 (b)(3) and n.5. Notably, the Sentencing Guidelines also provide an application note for when the enhance *does not* apply. *See id.*

In addition, Marchenko's requested time-served sentence would fail *entirely* to serve the goal of general deterrence and he is not in the same position as the defendants in the cases he cites in support of his request—none of whom were convicted of a money laundering conspiracy or for smuggling goods out of the United States. *See* Gov't Sent. Mem, *United States v. Nevidomy*, 17 Cr. 20407, Dkt. No. 38 (KMW) (S.D.F.L. 2018), at 5 (acknowledging defendant's cooperation and requesting he only receive a reduction based on a "5K motion"); *United States v. Ustinov*, 13 Cr. 34 (D. Del. 2014) (defendant sentenced to time served after pleading guilty to conspiring to violate the Arms Export Control Act); *Russian man pleads guilty in Wyoming to trying to illegally export military-grade weapons scopes*, Jan. 21, 2014, available at https://www.ice.gov/news/releases/russian-man-pleads-guilty-wyoming-trying-illegally-export-military-grade-weapons (defendant sentenced to 147 days' imprisonment after being charged with conspiracy to violate the Arms Export Control Act and knowingly and willfully attempting to export defense articles listed on the U.S. Munitions List to Russia, without having first obtained the required export license, for attempting to purchase ten thermal weapons sights, valued at approximately $5,000 each).

By contrast, a sentence within the Guidelines range would be akin to the sentence that similarly situated defendants that were convicted of money laundering offenses have received. *See, e.g.*, *United States v. Unsalan*, 23 Cr. 70 (M.D. Fla. Apr. 25, 2024) (defendant sentenced to 72 months' imprisonment after pleading guilty to conspiracy to commit money laundering to promote violations of U.S. sanctions); *United States v. Wang et al.*, 20 Cr. 254 (HB) (E.D.P.A. June 11, 2024) (two co-defendants sentenced to 45 months' imprisonment for attempting to violate the International Emergency Economic Powers Act ("IEEPA"), conspiracy to violate IEEPA, and conspiracy to commit money laundering based on defendants attempt to transact in sanctioned petroleum and launder the proceeds); PSR at 21 (noting that, according to Judiciary Sentencing Information, defendants with similar Guidelines received an average sentence of 42 months' imprisonment and a median sentence of 46 months' imprisonment).

A sentence of time-served would provide a would-be participant in an illegal procurement network every incentive to orchestrate a scheme to fraudulently obtain sensitive U.S. electronics—the financial reward is very high; the chance of being caught, extradited to the United States, and prosecuted is very low; and the punishment in the unlikely event of a successful prosecution is minimal (about a year in prison before being deported back to your home country). Such a sentence would be inadequate to vindicate the very important 3553(a) factor of general deterrence. Indeed, in cases such as these where the ability to detect the crime is difficult and the financial rewards of commission of the crime, promoting general deterrence is a particularly salient section 3553(a) factor for this Court to consider. *See Harmelin v. Michigan*, 501 U.S. 957, 989 (1991) (noting that crimes that are "significantly more difficult to detect may warrant substantially higher penalties"); *United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) ("Considerations of

(general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.") (quoting *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.)).

Respectfully, an unduly lenient sentence of time-served is *not* the message that this Court should send to the public—especially at a time when Russia is relying on U.S.-sourced electronics and components to continue its aggression against Ukraine.

**F. Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the Guidelines range of 57 to 71 months' imprisonment.

Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney

by: __/s___________________________
Jennifer N. Ong
Shiva H. Logarajah
Assistant United States Attorneys
(212) 637-2224/2272